IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF CONNECTICUT

IN THE MATTER OF THE SEARCH OF
THE PREMISES LOCATED AT
9 NORTH BANK STREET, NEW HAVEN,
CONNECTICUT

Case No. _3:18 mj 1621 (SALM)_

Filed Under Seal

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jeremy S. Tendler, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 search the premises known as 9 North Bank Street, New Haven, Connecticut ("SUBJECT PREMISES"), further described in Attachment A, for the things described in Attachment B.

2.    Based on the facts set forth in this affidavit, I believe that the SUBJECT PREMISES are presently being used in furtherance of 21 United States Code, Sections 841(a)(1) (Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy), and 844(a) and that there is probable cause to believe that search of the SUBJECT PREMISES will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3.    I am a United States Postal Inspector with the United States Postal Inspection Service and have been so employed since September 2016. I am currently assigned to the External Crimes Team, which includes responsibility for Prohibited Mail-Narcotics investigations. As a United States Postal Inspector working with the Prohibited Mail-Narcotics Team, my duties and responsibilities include, but are not limited to, the investigation of shipments of narcotics through

the United States Postal Service.  As such, I conduct surveillance of suspects, identify and inspect

suspicious packages and parcels, work with informants and federal, local and state police narcotics

task forces, execute search warrants and make arrests

4.    Prior to my employment with the United States Postal Inspection Service, I served

for six years as a Special Agent with the Internal Revenue Service's Criminal Investigation (IRS-

CI), and five years as a Tax Fraud Investigative Assistant with IRS-CI.  My Special Agent training

for IRS-CI included graduating from Federal Law Enforcement Training Center's Criminal

Investigator Training Program in Glynco, Georgia.

5.    I am a law enforcement officer of the United States within the meaning of Title 18

U.S.C. § 3061, and am empowered by law to conduct investigations and to make arrests for

offenses enumerated in Title 21 U.S.C. § 841(a) (1), and other federal offenses.

6.    The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrants and does not set

forth all of my knowledge about this matter.

## DESCRIPTION OF THE SUBJECT PREMISES

7.    The SUBJECT PREMISES is a private residence located at 9 North Bank Street in

New Haven, Connecticut that is a three story, single family home located on the North side of

North Bank Street.  The building is clad in bluish vinyl siding and has white trim around the

windows with no shutters.  The number '9' is clearly visible, and affixed to the right hand side of

the front door.

## PROBABLE CAUSE

***A.    Background on Postal Services***

8.      Based on my training and experience with the USPIS, I have become familiar with the delivery operations of the United States Postal Service (USPS), and the various delivery services such as Priority Mail and Priority Express Mail. Priority Express Mail offers guaranteed delivery in the number of days specified at the time the parcel is sent. Additionally, both services assign unique label numbers, allowing for parcels to be tracked by the customer and the sender while in transit to the destination. Also based on my training and experience, I know that individuals mailing illegal narcotics or payments for illegal narcotics will often-times address their parcels using false names and/or sender addresses to avoid detection by law enforcement. Combined, these factors make it appealing for narcotics trafficking organizations to utilize legal and legitimate shipping methods such as the USPS to transport their product and/or proceeds because it is a relatively anonymous, secure, and fast method of transportation.

9.      Based on my training and experience, I know that narcotics traffickers often send their illegal narcotics through the mail.  I also know that illegal drugs, including scheduled narcotics are sent through the mail from source locations such as Canada, China, Taiwan, and other locations.  I also know that individuals shipping controlled substances via the United States Mail often utilize Express Mail and Priority Mail.

***B.    Background on Dark Net Markets***

10.      Based on my training and experience and on information provided by reliable law enforcement sources, I know that individuals involved in the trafficking of illicit drugs are increasingly using Dark Network Markets ("DNMs") to distribute and purchase narcotics and

materials used to manufacture narcotics. The "Dark Network" refers to any portion of the Internet that can be accessed only with specific software, configurations or authorization. The most commonly known Dark Network is The Onion Router, otherwise known as TOR. People who access the Dark Network use a series of sites that anonymize their internet traffic, thereby making it difficult for law enforcement to track them via an Internal Protocol address. To further criminal activities, those distributing illicit goods, including narcotics, have established websites on the Dark Network, known as DNMs, on which they advertise and sell the illicit materials.

11.    Pretty Good Privacy (PGP) is an encryption program that provides cryptographic privacy and authentication for data communication. PGP is used for signing, encrypting, and decrypting texts, e-mails, files, directories, and whole disk partitions and to increase the security of e-mail communications. PGP can be used to send messages confidentially. For this, PGP combines symmetric-key encryption and public-key encryption. The message is encrypted using the sender's private encryption key and the sender's public encryption key. The message is sent to the receiver. The receiver then uses their private encryption key and the sender's public key to decrypt the message. Only the private key belonging to the receiver can decrypt the session key. I know based on my training and experience that DNM vendors often use PGP to encrypt their communications with co-conspirators, sources of supply, and customers.

12.    Based on my training and experience and on information provided by reliable law enforcement sources, I know that individuals involved in the trafficking of illicit drugs related to DNM illegal activity often take advantage of the anonymity of enhanced crypto-currencies such as Bitcoin. These digital currencies can be held in "Wallets". A crypto-currency wallet is a software program where crypto-currencies are stored. Crypto-currency wallets facilitate sending and receiving crypto-currency and gives ownership of the balance to the user. There are many

4

different types of crypto-currency wallets which can either be hosted online by a company such as CoinBase, on a software program such as Electrum or Jaxx, or a hardware device such as a Trezor or Nano Ledger.

13.      Based on my training and experience and on information provided by reliable law enforcement sources, I also know that DNM Vendors often use third-party postage services to add additional layers of anonymity to their transactions. These services allow their customers to purchase postage using crypto-currency.  In approximately the last year, on behalf of the USPIS your affiant has intercepted packages dispatched via the U.S. Mail which were shipped using these services, and in each case, the shipments have contained controlled substances.

## C.      *The Instant Investigation: ERNEST CANTEEN and MICHAEL LOTTO*

14.      Since in or around April of 2018, I have been participating in an investigation together with Officers and Agents of the United States Postal Inspection Service, United States Drug Enforcement Administration, United States Department of Homeland Security – Homeland Security Investigations, United States Postal Service – Office of Inspector General, Connecticut State Police – Statewide Narcotics Task Force, and New Haven Police Department of ERNEST CANTEEN and MICHAEL LOTTO

15.      On or about April 24, 2018, an inmate (Hereinafter referred to as "Confidential Informant 1") at the State of Connecticut Cheshire Correctional Institution wrote a letter to the United States Postal Service in New Haven, Connecticut alleging that a USPS employee named MICHAEL LOTTO who resides at 9 North Bank Street in New Haven, Connecticut was involved in trafficking methamphetamines and 'GHB'.  The letter stated the following, in part:

16.      "First off this is a serious matter in Regards to a employee who works there by the name of Michael Lotto from 9 North Bank Street New Haven CT.  He was arrested in 2014 for

drugs and again 2 months ago with Ernie Canteen for assult there is a protective order now in place. BUT MOST of all every 2 weeks 2 ounces of crystal Meth comes through the post office address to Canteen at 9 North Bank Street and Mike lotto makes sure it gets there to his husband Ernie who use to work there also.  Along with GHB in shampoo bottles that come through.  Mike goes home every day around 9:45am-10:30am to smoke Meth and shoot some heroin" The letter then goes on to state, "Ernie & Mike lotto order Crystal Meth off the dark web."

17.     I have researched Postal Employment records and found that MICHAEL LOTTO is, in fact, and employee of the USPS, and that he works at the Post Office located at 50 Brewery Street in New Haven, Connecticut.  According to USPS personnel records MICHAEL LOTTO has been employed by the USPS since January 6, 2007, and that his address of record is 9 North Bank Street, New Haven, CT 06511.

18.     MICHAEL LOTTO's personnel record reflects that on April 10, 2015, he received a written notice that he would be removed from USPS employment due to the fact that he had been arrested on or about March 19, 2014 for several narcotics related offenses, including possession of GHB.

19.     I have conducted law enforcement database searches for MICHAEL LOTTO. According to the records returned from those searches, MICHAEL LOTTO's Connecticut Driver's License reflects an address of 9 North Bank Street in New Haven, Connecticut.  MICHAEL LOTTO's arrest record reflects that he does have a criminal history for an assault charge in April of 2018, but no conviction appears from 2014.  Nonetheless, these items tend to corroborate the information contained in the letter from Confidential Informant 1.

20.     I have conducted law enforcement database searches for ERNEST CANTEEN. According to the records returned from those searches, ERNEST CANEEN's Connecticut Driver's

6

License reflects an address of 9 North Bank Street in New Haven, Connecticut.   ERNEST CANTEEN's arrest record reflects that he does have a criminal history for an assault charge in April of 2018.   These items tend to corroborate the information contained in the letter from Confidential Informant 1.

21.      Based on my training and experience, and the training and experience of the other officers and agents involved in the investigation I know that 'GHB' is a commonly used term that refers to gamma-hydroxybutyric-acid.   According to the Drug Enforcement Administration, GHB is a Schedule 1 Controlled Substance.   Methamphetamine is also a Schedule 1 Controlled Substance.

**D.**      ***Debriefing of Confidential Informant 1***

22.      On May 8, 2018 and May 16, 2018 members of the New Haven Police Department interviewed Confidential Informant 1. During those interviews, Confidential Informant 1 stated that he was previously involved in the operation and is willing to testify in court.

23.      Confidential Informant 1 stated that the drug distribution operation is being run from 9 North Bank Street in New Haven, where MICHAEL LOTTO and ERNEST CANTEEN reside, but also 7 North Bank Street, which is the residence of ERNEST CANTEEN's mother.

24.      Confidential Informant 1 stated that the fact that MICHAEL LOTTO is a postal employee aids in the reception of the contraband via the U.S. Mail. Confidential Informant 1 stated that MICHAEL LOTTO and ERNEST CANTEEN receive distribution quantities of amphetamine and GHB each week; which they break down and redistribute.  Also according to Confidential

Informant 1, MICHAEL LOTTO comes home from work in the middle of the day to receive the packages of drugs.

25.    Confidential Informant 1 detailed several customers and associates of MICHAEL LOTTO and ERNEST CANTEEN, as well as the costs, profits, and methods of the organization which includes operation throughout Connecticut.

26.    Confidential Informant 1 also advised that the organization is involved in purchasing counterfeit currency on the Dark Web. The CI stated that the ring uses a few sources and purchases approximately ($10,000.00) ten thousand dollars at a time. All the counterfeit currency is in ($20.00) twenty-dollar bills and Bitcoins are used to make the purchases. The counterfeit bills are used to purchase pre-paid cards at Walmart located at 315 Foxon Blvd, New Haven.

27.    Confidential Informant 1 also advised that MICHAEL LOTTO and ERNEST CANTEEN purchases small amounts of black tar heroin on the Dark Web (approximately 5 grams). Confidential Informant 1 stated that the heroin is sold at high prices due to the fact that it is not readily available in this region

***Seizure of International Parcel 1***

28.    On April 22, 2018, Officers of the U.S. Department of Homeland Security – Customs and Border Protection (CBP) in Memphis, Tennessee conducted a routine examination of an international FedEx parcel bearing the return address "C/O Hecny Transportation LTD,

DD125 Lot 844 RP Ping HA Road HA, Suen Laufau Shan Yuen Long Hong Kong, KOWL OON, 180 Hong Kong, HK" and the delivery address "Marcell Therien, 9 North Bank Street, New Haven, CT 06511".

29.   Within this parcel, CBP Officers located approximately 1.5 Kilograms of Gamma-Butyrolactone (GBL).  According to the Drug Enforcement Administration, GBL is a Schedule 1 Controlled Substance.

**E.      *Seizure of International Parcel 2***

30.   On May 23, 2018, Officers of the U.S. Department of Homeland Security – Customs and Border Protection in Cincinnati, Ohio conducted a routine examination of an international parcel bearing DHL tracking number 3652180092.  The parcel bore the return address "Huo Hong Yu, 2 F Building B 30ST Guanlong Indust, Tsing Yi, Ho, HK 518000" and the delivery address "Marcell Therien, 9 North Bank Street, New Haven, CT 06511"

31.   Within this parcel, CBP Officers located approximately 1.55 Kilograms of Gamma-Butyrolactone.

**E.      *Undercover Purchase 1***

32.   On May 9, 2018, Officers of the Connecticut State Police – Statewide Narcotics Task Force (hereinafter "SNTF") conducted an undercover purchase of one gram of Methamphetamine from ERNEST CANTEEN at the SUBJECT PREMISES.  The transaction was itself was conducted by a Confidential Informant (hereinafter "Confidential Informant 2") who had proven reliable to SNTF.

33.   SNTF Officers met with Confidential Informant 2 at a predetermined location in the city of New Haven in order to conduct the controlled purchase of methamphetamine.

Confidential Informant 2 stated he/she had purchased methamphetamine from ERNEST CANTEEN in the past and had done so as recently as three weeks prior to the instant meeting.

34.     SNTF Officers performed a search of both Confidential Informant 2's person and his/her vehicle for narcotics/paraphernalia and funds with negative results. Confidential Informant 2 was handed $100 of pre-recorded SNTF funds for the purpose of purchasing methamphetamine. In the presence of SNTF Officers Confidential Informant 2 contacted ERNEST CANTEEN via phone #203-551-0969 and asked ERNEST CANTEEN if he/she could stop by. ERNEST CANTEEN said that he/she could.

35.     Confidential Informant 2 then drove to the SUBJECT PREMISES followed closely by SNTF Officers.

36.     Confidential Informant 2 continued onto North Bank Street and pulled up to the curb in front of the SUBJECT PREMISES where he/she then parked. Constant surveillance was maintained while in route and at no point did Confidential Informant 2 make contact with anyone prior to reaching the SUBJECT PREMISES.

37.     Confidential Informant 2 exited the vehicle and was met outside by ERNEST CANTEEN. No hand to hand contact was seen at this time and Confidential Informant 2 was then let into the house by ERNEST CANTEEN.

38.     After a brief period of time Confidential Informant 2 exited the house and entered his/her vehicle. Confidential Informant 2 pulled away from the residence and began to make his/her way back to a predetermined location for a post narcotics purchase debrief. SNTF Officers maintained a constant visual of Confidential Informant 2 and followed him/her back to the debrief location. At no point after the controlled narcotics purchase did Confidential Informant 2 come into contact with anyone.

39.     At the predetermined post purchase location Confidential Informant 2 immediately handed SNTF Offices the suspected meth. Confidential Informant 2's person and his/her vehicle was searched again for narcotics/paraphernalia and funds with negative results.

40.     Confidential Informant 2 was debriefed and described ERNEST CANTEEN as a black male approximately six feet tall of medium build, bald, clean shaven who was wearing what appeared to be a blue button down shirt and blue jeans. Confidential Informant 2 stated he/she met ERNEST CANTEEN outside the residence and the two then walked inside together. Confidential Informant 2 talked a little bit with ERNEST CANTEEN before the two proceeded to ERNEST CANTEEN's third floor bedroom. Inside the bedroom was a larger bag of suspected methamphetamine and ERNEST CANTEEN stated he would be getting more that weekend. ERNEST CANTEEN measured out (1) gram of meth from the larger bag and handed it to the Confidential Informant 2 who handed $100 of SNTF funds to ERNEST CANTEEN. Confidential Informant 2 and ERNEST CANTEEN talked a little bit more before Confidential Informant 2 left.

*41.*     Confidential Informant 2 provided a sworn written statement to SNTF Officers regarding this controlled purchase for Meth and stated he/she would be willing to participate in another controlled purchase.

*42.*     SNTF Officers subjected the suspected methamphetamine to a test using the TruNarc analyzer which returned a positive indication for the presumptive presence of methamphetamine.

**E.     *Undercover Purchase 2***

43.     On June 5, 2018, Officers of the Connecticut State Police – Statewide Narcotics Task Force (hereinafter "SNTF") conducted an undercover purchase of three and one half (3.5) grams of methamphetamine from ERNEST CANTEEN at the SUBJECT PREMISES.   The

transaction was itself was conducted by a Confidential Informant (hereinafter "Confidential Informant 2.

44.     SNTF Officers met with Confidential Informant 2 at a predetermined location in the city of New Haven in order to conduct a controlled purchase of methamphetamine.

45.     SNTF Officers performed a search of both Confidential Informant 2's person and his/her vehicle for narcotics/paraphernalia and funds with negative results. Confidential Informant 2 was handed $100 of pre-recorded SNTF funds for the purpose of purchasing methamphetamine. In the presence of SNTF Officers Confidential Informant 2 contacted ERNEST CANTEEN via phone #203-551-0969 and asked ERNEST CANTEEN if he/she could stop by. ERNEST CANTEEN said that he/she could.

46.     Confidential Informant 2 then drove to the SUBJECT PREMISES followed closely by SNTF Officers.  Confidential Informant 2 continued onto North Bank Street and pulled up to the curb in front of the SUBJECT PREMISES where he/she then parked. Constant surveillance was maintained while in route and at no point did Confidential Informant 2 make contact with anyone prior to reaching the SUBJECT PREMISES. Confidential Informant 2 exited the vehicle and entered the residence.  Confidential Informant 2 had no contact with any individuals prior to entering the residence.

47.     After a brief period of time Confidential Informant 2 exited the house and entered his/her vehicle. Confidential Informant 2 pulled away from the residence and began to make his/her way back to a predetermined location for a post narcotics purchase debrief. SNTF Officers maintained a constant visual of Confidential Informant 2 and followed him/her back to the debrief location. At no point after the controlled narcotics purchase did Confidential Informant 2 come into contact with anyone.

48.     At the predetermined post purchase location Confidential Informant 2 immediately handed SNTF Offices the suspected meth. Confidential Informant 2's person and his/her vehicle was searched again for narcotics/paraphernalia and funds with negative results.

49.     Confidential Informant 2 was debriefed and described ERNEST CANTEEN as a black male approximately six feet tall of medium build, bald, who was wearing a white tee shirt and blue jeans during this narcotics purchase.

50.     Confidential Informant 2 stated he/she met ERNEST CANTEEN inside the residence and the two headed directly to the third floor. ERNEST CANTEEN proceeded to the newly built addition area of the third floor located in the rear of the residence before returning with a large bag of suspected methamphetamine. Confidential Informant 2 stated he/she estimated the bag to be approximately two ounces of methamphetamine. ERNEST CANTEEN removed a portion of the suspected methamphetamine, weighed it and placed it into a small zip lock style bag before handing it to the Confidential Informant 2. Confidential Informant 2 handed $100 of SNTF funds to ERNEST CANTEEN and the two talked a bit more before the CI exited the residence. Confidential Informant 2 stated ERNEST CANTEEN was home alone at the time of the narcotics purchase.

51.     Confidential Informant 2 provided a sworn written statement to SNTF Officers regarding this controlled purchase for Meth and stated he/she would be willing to participate in another controlled purchase.

52.     SNTF Officers subjected the suspected methamphetamine to a test using the TruNarc analyzer which returned a positive indication for the presumptive presence of methamphetamine.

13

### F.    *Intercepted Domestic Parcel*

53.    On June 8, 2018, USPIS personnel in Los Angeles, California were alerted to a number of parcels that were deemed suspicious.  Among the referred parcels was a USPS Priority Mail Express Parcel bearing tracking number 9470 1368 9784 6375 6975 04, return address "Tim Nguyen Crown Vapors, 13471 Magnolia St., Garden Grove, CA  92844" and delivery address "Jayson Smith, 9 Bank St., New Haven, CT 06511-2519" ("The Subject Parcel")

54.    After checking the information on the parcel through USPIS resources, USPIS personnel attempted to contact the sender on the parcel, Crown Vapors.  USPIS personnel obtained and called telephone number (714) 539-0099 for Crown Vapors and spoke with Daniel Ramirez, the business owner.  Ramirez provided consent to open the Subject Parcel.

55.    Upon opening the Subject Parcel, USPIS personnel located a folded/stapled piece of paper, and a black plastic bubble wrap envelope, which contained a Mylar Ziploc bag.  Within the Mylar Ziploc bag, was a smaller Ziploc bag, which contained a white crystal substance which was suspected of being methamphetamine.  The suspected methamphetamine was weighed and determined to be approximately 29grams.

### G.    *Undercover Purchase 3*

56.    On September 27, 2018, Officers of the Connecticut State Police – Statewide Narcotics Task Force (hereinafter "SNTF") conducted a third undercover purchase of methamphetamine from ERNEST CANTEEN.  The transaction was itself was conducted by Confidential Informant 1.

57.    SNTF Officers met with Confidential Informant 1 at a predetermined location in the city of New Haven in order to conduct a controlled purchase of methamphetamine.

58.     SNTF Officers performed a search of both Confidential Informant 1's person and his/her vehicle for narcotics/paraphernalia and funds with negative results. Confidential Informant 1 was handed $100 of pre-recorded SNTF funds for the purpose of purchasing methamphetamine. In the presence of SNTF Officers Confidential Informant 1 contacted ERNEST CANTEEN via text message to phone #203-551-0969 and arranged to meet ERNEST CANTEEN at a predetermined location.

59.     Confidential Informant 1 then drove to the predetermined location followed closely by SNTF Officers.  Constant surveillance was maintained while in route and at no point did Confidential Informant 1 make contact with anyone while traveling to the predetermined location or prior to meeting with ERNEST CANTEEN.

60.     SNTF had also set up surveillance in the area of the SUBJECT PREMISES where they had a clear view of the street as well as the SUBJECT PREMISES.  SNTF officers observed ERNEST CANTEEN exit the SUBJECT PREMISES wearing a white shirt and enter a Honda bearing Connecticut registration AL97767. A query of law enforcement databases revealed the registration for the vehicle returned to a green 1997 Honda Accord registered to MICHAEL LOTTO (Date of Birth 04/04/1962) of 9 North Bank Street in New Haven. ERNEST CANTEEN pulled away from the SUBJECT PREMISES and began driving to the predetermined location to meet with the Confidential Informant 1. SNTF officers maintained a constant visual of ERNEST CANTEEN until he arrived at the predetermine location and parked the vehicle. Confidential Informant 1 walked over to the Honda and met with ERNEST CANTEEN for a brief moment where an exchange was made. Confidential Informant 1 then walked away from the Honda and proceeded to a predetermined location where he/she was met by SNTF officers.

61.     At the post purchase debrief location Confidential Informant 1 immediately handed SNTF officers the suspected methamphetamine. Confidential Informant 1's person was searched again for narcotics/paraphernalia and funds with negative results.

62.     Confidential Informant 1 was debriefed and described ERNEST CANTEEN as a black male of medium build, bald, who was wearing a white tee shirt during this narcotics purchase. Confidential Informant 1 stated he/she met ERNEST CANTEEN at the vehicle he was driving, a green Honda Accord.  Confidential Informant 1 handed $100 of SNTF funds to ERNEST CANTEEN who handed Confidential Informant 1 a small plastic bag containing the suspected methamphetamine. Confidential Informant 1 then left ERNEST CANTEEN and proceeded to the predetermined location to meet with SNTF officers.

63.     SNTF Officers subjected the suspected methamphetamine to a test using the TruNarc analyzer, which returned a positive indication for the presumptive presence of methamphetamine.  The total weight of the suspected methamphetamine when weighed within the bag was approximately 1.7 grams.

### G.     *Undercover Purchase 4*

64.     On October 16, 2018, Officers of the Connecticut State Police – Statewide Narcotics Task Force (hereinafter "SNTF") conducted a fourth undercover purchase of methamphetamine from ERNEST CANTEEN.  The transaction was itself was conducted by Confidential Informant 1.

65.     SNTF Officers met with Confidential Informant 1 at a predetermined location in the city of New Haven in order to conduct a controlled purchase of methamphetamine.

66.     SNTF Officers performed a search of both Confidential Informant 1's person and his/her vehicle for narcotics/paraphernalia and funds with negative results. Confidential Informant

1 was handed $100 of pre-recorded SNTF funds for the purpose of purchasing methamphetamine. In the presence of SNTF Officers Confidential Informant 1 contacted ERNEST CANTEEN via text message to phone #203-551-0969 and arranged to meet ERNEST CANTEEN at a predetermined location.

67.     Confidential Informant 1 was then transported to the predetermined location by SNTF Officers.  While waiting for ERNEST CANTEEN to arrive Confidential Informant 1 received a text message from ERNEST CANTEEN stating that there was a change of plans and for Confidential Informant 1 to go to "Shell', which is the Shell gas station located nearby at 141 Willow Street in New Haven, Connecticut. Confidential Informant 1 communicated this information to SNTF officers, who made the decision to allow Confidential Informant 1 to meet ERNEST CANTEEN at the new location. Confidential Informant 1 proceeded to the Shell gas station located at 141 Willow Street while under the surveillance of SNTF officers. At no point did Confidential Informant 1 make contact with anyone while in route to this new location.

68.     Soon after, SNTF personnel observed what appeared to be a light skin male exit the SUBJECT PREMISES wearing a blue jacket and jeans. This male proceeded on foot in the direction of another SNTF officer who was positioned nearby, and who observed this same unknown male walk past his vehicle and continue on foot in the direction of 141 Willow Street. The second SNTF officer described this man as a dark skin male, wearing a dark jacket and a hair style with a poof in the front but cut short on the sides.

69.     SNTF officers maintained a constant visual of Confidential Informant 1 at the Shell gas station as he waited for ERNEST CANTEEN to arrive. After a brief period of time an unknown male with dark complexion wearing what appeared to be a dark colored sweater, blue jeans, and poofy style hair in the front approach Confidential Informant 1. The two appeared to exchange

17

words and a hand to hand was made in the parking lot of the Shell gas station. The unknown male turned back and walked away from the Shell gas station and headed on foot in the direction of the SUBJECT PREMISES. Confidential Informant 1 walked in the opposite direction of this unknown male before he was picked up by SNTF officers.

70.     SNTF officers maintained their surveillance positions of the SUBJECT PREMISES during this controlled narcotics purchase. Shortly after the hand to hand was completed SNTF personnel observed this same unknown male with dark complexion as he walked towards and entered the SUBJECT PREMISES.

71.     At the post purchase debrief location Confidential Informant 1 immediately handed SNTF officers the suspected methamphetamine. Confidential Informant 1's person was searched again for narcotics/paraphernalia and funds with negative results.

72.     Confidential Informant 1 was debriefed and described the controlled purchase. Confidential Informant 1 stated that as he waited at the predetermined location to meet with ERNEST CANTEEN, ERNEST CANTEEN sent him a text stating change of plans. Confidential Informant 1 was told to head to the Shell gas station which Confidential Informant 1 stated ERNEST CANTEEN had done in the past many times with other customers who were looking to purchase narcotics. Confidential Informant 1 stated ERNEST CANTEEN wouldn't trust all customers and would make them wait at this Shell gas station. Confidential Informant 1 then proceeded to the gas station and once there he texted ERNEST CANTEEN stating he was there. ERNEST CANTEEN told Confidential Informant 1 he should see 'Carlos'. Confidential Informant 1 was then approached by 'Carlos'. Confidential Informant 1 and 'Carlos' made the exchange in front of the Shell gas station and 'Carlos' walked away. Confidential Informant 1 stated ERNEST CANTEEN would normally use "runners" or other individuals to transport narcotics to the deal location and make

18

the deal. Confidential Informant l stated he immediately recognized 'Carlos', who he described as a thin male with a dark complexion, approximately six feet tall wearing a dark colored top and jeans and described him as a Hispanic male, possibly Dominican with an accent. Confidential Informant l stated that after the deal was done he walked away from the Shell gas station toward the predetermined meet location where he was then picked up by NSTF officers.

73.     SNTF Officers subjected the suspected methamphetamine to a test using the TruNarc analyzer which returned a positive indication for the presumptive presence of methamphetamine. The total weight of the suspected methamphetamine when weighed within the bag was approximately 1.6 grams.

74.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. There are currently two types of IP addresses in use in the United States, one type is known as an IPV4, and the other is an IPV6. An IPV4 address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). An IPV6 address are represented as eight groups of four hexadecimal digits with the groups being separated by colons, for example 2001:0db8:0000:0042:0000:8a2e:0370:7334, but methods to abbreviate this full notation exist. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers

have static—that is, long-term—IP addresses, while other computers have

dynamic—that is, frequently changed—IP addresses.

b. Internet: The Internet is a global network of computers and other electronic

devices that communicate with each other.  Due to the structure of the

Internet, connections between devices on the Internet often cross state and

international borders, even when the devices communicating with each

other are in the same state.

c. Storage medium: A storage medium is any physical object upon which

computer data can be recorded.  Examples include hard disks, RAM, floppy

disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

75.     As described above and in Attachment B to the search warrants for the SUBJECT

PREMISES, this application seeks permission to search for records that might be found in the

SUBJECT PREMISES, in whatever form they are found.  One form in which the records might

be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant

applied for would authorize the seizure of electronic storage media or, potentially, the copying of

electronically stored information, all under Rule 41(e)(2)(B).

76.     *Probable cause.*  I submit that if a computer or storage medium is found in the

SUBJECT PREMISES, there is probable cause to believe those records will be stored on that

computer or storage medium, for at least the following reasons:

d. Based on my knowledge, training, and experience, I know that computer

files or remnants of such files can be recovered months or even years after

they have been downloaded onto a storage medium, deleted, or viewed via

the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

e.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

f.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

g.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

77.     *Forensic evidence.* As further described in Attachment B to SUBJECT PREMISES warrants, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

    h.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    i.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or

alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have

geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

j.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

k.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along

to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

l.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

m. I know that when an individual uses a computer to access the DNMs, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

78.   *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often

requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

n. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

o. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it

26

difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

p. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

79.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

80.   In my training and experience, it is likely that the SUBJECT PREMISES will contain at least one smart phone because on October 3, 2018, I drove by the SUBJECT PREMISES and observed ERNEST CANTEEN holding what appeared to be a smartphone.  The device I observed appeared black in color and was consistent in shape and size with a smartphone, such as an Apple, Samsung, LG, HTC, Motorola, or Google device.

81.   I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, Samsung, LG, HTC, Motorola, and Google that some models of Apple, Samsung, LG, HTC, Motorola, and Google devices such as iPhones, iPads, Samsung Galaxy, LG G5, HTC 10, and Google Pixel devices,  offer their users

the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is commonly referred to as Touch ID.

82.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device. With respect to Samsung devices, a user who enables TouchID can store up to four fingerprints that can be used to unlock that device. Like the Apple, the user places their finger on the sensor embedded in the Galaxy S 6's home button and the phone will unlock without needing a passcode. For LG G5 and Google Pixel devices the fingerprint sensor is located on the back of the device, but these devices can also store up to five fingerprints. The HTC 10 fingerprint scanner is on the front of the device and this device can register up to five fingerprints.

83.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. For Apple devices these circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters

a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.  Similar restrictions exist for Samsung, LG, HTC, Motorola, and Google devices.

84.     The passcode or password that would unlock the Touch ID device(s) that might be found during the search of the SUBJECT PREMISES is not known to law enforcement.  Thus, it will likely be necessary to press the finger(s) of the user(s) of the Touch ID device(s) found during the search of the SUBJECT PREMISES to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock the relevant device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

85.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the SUBJECT PREMISES to press their finger(s) against the Touch ID sensor of the locked device(s)

29

found during the search of the SUBJECT PREMISES in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

86.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the device(s) found in the SUBJECT PREMISES as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

87.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the SUBJECT PREMISES to the Touch ID sensor of the Touch ID device(s), such as an iPhone, iPad, or Samsung Galaxy, LG G5, HTC 10, and Google Pixel devices found at the SUBJECT PREMISES for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

## **AUTHORIZATION REQUEST**

88.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41, as this affidavit supports probable cause for such warrants to search the SUBJECT PREMISES described in Attachment A, and seize the items described in Attachment B.

## **REQUEST FOR SEALING**

89.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the applications and search warrants. I believe that sealing this document is necessary because the items and

information to be seized are relevant to an ongoing investigation in which not all of the targets of will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.


JEREMY S. TENDLER

UNITED STATES POSTAL INSPECTOR


Subscribed and sworn to before me on the 18th of October, 2018

/s/ Sarah A. L. Merriam, USMJ

SARAH A.L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

31

## ATTACHMENT A: LOCATION TO BE SEARCHED

The SUBJECT PREMISES is a private residence located at 9 North Bank Street in New Haven, Connecticut that is a three story, single family home located on the North side of North Bank Street.  The building is clad in greenish vinyl siding and has white trim around the windows with no shutters.

See photographs below for additional details.

 

## ATTACHMENT B: ITEMS TO BE SEIZED

1.     All records relating to violations of 21 U.S.C. §§ 841(a)(1), 846 and 844(a), those violations involving ERNEST CANTEEN, MICAHEL LOTTO, ROBERT PISCATELLI, and occurring after September 1, 2016, including:

A.  General ledgers, cash receipts journals, cash disbursement journals, petty cash journals, bank statements, passbooks, cancelled checks, check stubs or registers, deposit tickets, deposit receipts, cashier's checks, money orders, wire transfer documents, invoices, written estimates, receipts, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts receivable ledgers, correspondence, memoranda and documents;

B.  Records of income, expenses, and assets such as profit and loss statements, financial statements, balance sheets and income and expense journals;

C.  Bank records, including but not limited to cancelled checks, cashier's checks, money orders, statements, deposit tickets, and withdrawal slips;

D.  Address books (paper or electronic) reflecting names, addresses and telephone numbers, telephone toll records, diaries, daily planners and calendars;

E.  Records evidencing the obtaining, secreting, transfer, concealment, transfer or expenditure of money, cryptocurrency, United States currency, papers, and identification documents, whether kept manually and/or by mechanical, and/or electronic devices pertaining to the wiring and/or receipt of funds;

F.  Identification documents and keys evidencing a possessory interest in premises and vehicles;

G.  Records relating to the operation or ownership of any computer hardware, software, storage media, or data (such as user names, passwords, telephone records, notes, books, diaries, and reference materials);

H.  Records of mailings dispatched through the U.S. Mail or other interstate carriers;

I.  Records pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media;

J.  Records relating to ownership, occupancy, or use of the SUBJECT PREMISES (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers);

K.  All computer equipment and peripherals that may be interdependent, the software to operate the computer system, related instruction manuals that contain directions concerning the operation of the computer system, the software programs, and all electronically stored or computerized computer data; any physical keys, encryption devices, dongles, passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data;

L.  Any computer equipment or digital devices that are capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, including central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices including paging devices and cellular telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related

3

communication devices such as modems, routers, cables, and connections; storage media; and security devices;

M.  Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

N.  Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing, equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

O.  All passwords, passphrases, encryption keys, encryption dongles, and/or any information, including tools, records, and techniques used to activate and/or navigate and access in plain-text data stored in encrypted data systems, encrypted file systems, encrypted files, and encrypted records or documents; and

P.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during the time the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email,

4

instant messages, and other electronic   communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software.